Jeffrey J. Hunt (5855) (jhunt@parrbrown.com)
Rachel L. Wertheimer (13893) (rwertheimer@parrbrown.com)
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah  84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

Maria Crimi Speth (Ariz. Bar No. 012574) (mcs@jaburgwilk.com)
Aaron K. Haar (Ariz. Bar No. 030814) (akh@jaburgwilk.com)
JABURG & WILK, P.C.
3200 N. Central Avenue
Phoenix, Arizona 85012
Telephone: (602) 248-1000
Facsimile: (602) 248-0522
Admitted *pro hac vice*

Attorneys for Defendant Xcentric Ventures, LLC

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VISION SECURITY, LLC, a Utah Limited Liability Company, ROB HARRIS, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> XCENTRIC VENTURES, LLC, an Arizona Limited Liability Company, <br><br> Defendant. | **XCENTRIC'S MOTION FOR SUMMARY JUDGMENT** <br> (Hearing Requested) <br><br> Case No. 2:13-CV-00926 <br><br> Judge Jill N. Parrish <br> Chief Magistrate Judge Brooke C. Wells |

Pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, and DUCivR 56-1,

Defendant Xcentric Ventures, LLC ("Xcentric") hereby moves for summary judgment on all of

the claims asserted by Plaintiffs Vision Security, LLC ("Vision Security") and Rob Harris

("Harris") (sometimes referred to collectively as "Vision Security") in their First Amended

Complaint dated January 22, 2016 ("Complaint").  Summary judgment is appropriate because

there are no genuine issues of material fact, and Xcentric is entitled to judgment as a matter of

law.  Xcentric respectfully requests a hearing on this motion.

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... iv

BACKGROUND FACTS .............................................................................................. vi

    The Rees Post.......................................................................................................... vi

    The Second Rees Post and Rebuttal Posts ............................................................ vii

    Free Online Public Forums Like Ripoff Report Provide an Important Public Service ......... viii

    Reports Must be True and Accurate ....................................................................... ix

    Ripoff Report Offers Several Options for Addressing Negative Reports.................................x

    Xcentric's Consumer Advocacy Program "CAP" ................................................. xii

    Xcentric's Policy of Not Removing Reports Furthers Its Purpose of Serving
    Consumers.............................................................................................................xv

    Vision Security's History of Deceptive Business Practices ................................. xvii

STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS ...........................xx

    I.      IMMUNITY FROM LIABILITY UNDER 47 U.S.C. § 230 .........................................xx

    II.     DEFAMATION AND LIBEL .................................................................. xxiii

    III.    TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS
            ................................................................................................................. xxiii

    IV.    VIOLATION OF UTAH'S DECEPTIVE TRADE PRACTICES ACT, UTAH CODE §
            13-11a-3 ................................................................................................. xxiv

    V.     VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)(1) ........................... xxiv

ARGUMENT .................................................................................................................1

I.   XCENTRIC IS ENTITLED TO SUMMARY JUDGMENT ON ALL VISION
     SECURITY'S CLAIMS BECAUSE THEY ARE ALL BARRED BY
     SECTION 230.........................................................................................................2

     A.   There is No Dispute the First Two Elements of Section 230 are Met Here ...........3

     B.   There is No Genuine Dispute that Vision Security's Claims Are Based on
          Information Provided Entirely By Another Information Content Provider............5

          1.   There is No Evidence Xcentric Solicited or Encouraged Rees (Or Any Other
               Third-Party User) to Post False and Defamatory Content on Ripoff Report.....5

          2.   Xcentric's Refusal to Remove the Rees Post is an Exercise of Its Traditional
               Editorial Functions, For Which Xcentric Retains Section 230 Immunity .......8

          3.   Xcentric's Corporation Advocacy Program is Not Evidence that Xcentric
               Solicited or Encouraged Rees (Or Any Other Third-Party User) to Post False
               and Defamatory Content on Ripoff Report ....................................................11

          4.   Ripoff Report's Taglines Did Not Solicit or Encourage Rees (Or Any Other
               Third-Party User) to Post False and Defamatory Content on Ripoff Report .12

II.  FOR ADDITIONAL REASONS, XCENTRIC IS ENTITLED TO SUMMARY
     JUDGMENT ON VISION SECURITY'S CLAIMS UNDER THE UTAH
     DECEPTIVE TRADE PRACTICES ACT AND THE LANHAM ACT......................15

     A.   Vision Security's Utah Deceptive Trade Practices Act Claim Fails.....................16

     B.   Vision Security's Lanham Act Claim Fails .........................................................18

          1.   Vision Security's Lanham Act Claim Does Not Pertain to Intellectual
               Property, and Applying Section 230 Immunity in This Instance will Neither
               Limit nor Expand any Law Pertaining to Intellectual Property ...................18

          2.   Even Apart From Section 230 Immunity, Vision Security Cannot Survive
               Summary Judgment on Its Lanham Act claim ..............................................20

CONCLUSION.............................................................................................................21

## INTRODUCTION

This case is about a negative review of Vision Security that one of its former sales representatives posted on the popular consumer-review website Ripoff Report, www.ripoffreport.com, operated by Xcentric.  Rather than sue the sales representative, Anthony Rees ("Rees"), for his unflattering statements, Vision Security paid Rees $1,000, secured an affidavit from Rees in which he recanted his negative post, and then signed him back up as a sales representative for Vision Security.  Three years later—two years *after* the statute of limitations for filing a defamation claim had run—Vision Security and its Chief Executive Officer, Harris, sued Xcentric for defamation and related claims, all based upon the statements that *Rees posted* on Ripoff Report.

Unfortunately, this is not new territory for Xcentric.  It has been sued scores of times by parties seeking to hold it liable for negative statements posted by others on Ripoff Report.  Too often these lawsuits are filed by companies that have a history of regulatory violations, like Vision Security, which has been sanctioned multiple times by state regulatory authorities for engaging in deceptive business practices, paid tens of thousands of dollars in fines, and lost its license to do business in several states.  Congress foresaw the problem, and in 1996 enacted Section 230 of the Communications Decency Act ("Section 230"), 47 U.S.C. § 230, which provides website operators like Xcentric immunity from suit for material posted on their websites by third party users.  Ripoff Report is the prototypical website operator for whom Section 230 provides statutory immunity.  In fact, since 1996, every state and federal court that has considered the merits of a claim against Ripoff Report has, without exception, found that it is entitled to Section 230 immunity for statements posted by third-party users.

This case is no different.  The statements that Rees posted on Ripoff Report fall squarely within the protections of Section 230.  Although Judge Waddoups previously found the allegations in the Complaint sufficient to withstand a motion to dismiss (where the truth of the allegations must be assumed), such allegations cannot survive summary judgment.  Contrary to their allegations, Vision Security and Harris have adduced *no evidence* that Xcentric contributed to, encouraged, or solicited the allegedly false and defamatory statements posted by Rees.  Further, Vision Security and Harris have produced *no evidence* that Rees ever contacted Xcentric and requested that his post be removed, or that Xcentric refused to allow Harris or Rees to post a rebuttal to Rees' post.  In fact, the uncontroverted evidence establishes exactly the opposite—Xcentric encouraged Harris to post a rebuttal to the Rees post (at no cost to Vision Security), but Vision Security chose not to do so.  Moreover, Rees posted a second statement on Ripoff Report in which he stated that his original post "was made out of frustration with Vision Security," that he "made some untrue and unfair accusations," and that he apologized.[1]

If Vision Security had a beef with the Rees post, its legal recourse, if any, was against Rees, not Xcentric.  Notwithstanding Vision Security's creative attempts to plead around Xcentric's Section 230 immunity, because all of its claims are based upon the Rees post, they are all barred by Section 230 and should be dismissed.

---

[1] As explained below, even if Rees had requested that Xcentric remove his post and Xcentric refused, Xcentric still would be entitled to immunity under Section 230.  The clear weight of authority, including Tenth Circuit law, holds that a website operator's failure or refusal to remove content, even at the request of the author, is the exercise of a traditional editorial function and does not strip the website operator of its immunity under Section 230.  *See, infra*, Argument, Sec. 1(B).

## BACKGROUND FACTS

### The Rees Post

On March 4, 2010, Rees posted the following review of Vision Security and Rob Harris

on the Ripoff Report website, www.ripoffreport.com, a consumer-review website operated by

Xcentric:

**Vision Security Vision Satellite, Rob Harris, Daniel Rodriguez A COMPANY AND PEOPLE THAT FAIL TO PAY AND TREAT THEIR EMPLOYEES FAIRLY, BIG SCAMMERS!  Orem, Utah**

Rob Harris and the "company" (a handful of guys) that is Vision Security is deceptive in all levels of its operation.  The company lies right to your face, with a smile on its own.  They have absolutely no problem telling you what you want to hear in order to squeeze more work out of you.  They pack more than 6 or 7 people into a tiny apartment, doesn't pay them for weeks on end (because of "funding" issues) and then reams the employees for not working hard enough.  Rob Harris's "company", "Vision Security" has had multiple threats of litigation from large companies such as ADT levied as his, and others' sales techniques are extremely deceptive.  Currently they are facing charges from Monitronics and Platinum Protection for some of these deceptive ripoffs.  This "Alarm Company" imitates other companies that are major companies in the industry, and makes the customer signing a contract seem like a continuation of their current service for less.  This is not the case.

Not only does Vision Security lie to its employees, and not pay them/pay them in any timely manner, but the services provided by Vision Security are inferior.  They cant do hardwired systems and just "LOOP" the system which is a ripoff to its customers system because of the high likelihood it will fail.  Promised equipment never finds its way to the customer, and many wonder what they even signed for.

For the constant failures/incompetence on Vision Security and its upper staff, Vision Security punishes the Salesmen.  Those who allow his "business" to even exist are talked out of their money, and made to feel like they are challenging a very honest person.  Truth is, there are plenty of smiling liars within this so called Company.  Daniel Rodriguez, a manager with Vision Security, is one of them.  Daniel and others within the Company constantly say one thing to set you aside for a day or two and then go and do another knowing things are not going to be settled.  Its all a big joke to them.  Rob "Owner" Harris as he calls himself has the audacity to stare people who have come across the country to work for him in the

face, and make them suffer "just a little longer". Then he fires them. He guilt trips, he'll spin, he'll make all in the industry look shady and like a bad guy before he'll admit the slightest err. Trust me this is exactly what happens to their employees. Rob, Daniel, and others including Corporate guys, will get you to work a little bit harder to think you are getting paid and then just say, "oh that wasn't enough, sorry".

Vision Security needs to fail for its poor business ethics. They need to be swept in the wind of legal litigation by these larger companies and sent far away. They have no business signing any new salesmen, or clients. Whether they intend to screw them or not is not really the question. But the consistency in having an excuse for all, and them not providing the cash or services to its employees or its clients deems Vision Security unfit for the business world and ought to be stopped from handling something as important as Home Security.

Smiling or not smiling, a liar's a liar. And this lying Company, Vision Security, ought to be stopped and sued for its damages to employees, clients, and other companies.

[Declaration of Anette Beebe ("Beebe Decl."), filed concurrently herewith, ¶ 5 & Exh.

"1" thereto.][2]

## **The Second Rees Post and Rebuttal Posts**

Following publication of the Rees Post, Rees posted a second statement on Ripoff Report

("Second Rees Post") in which he stated that his original post "was made out of frustration with

Vision Security," that he "made some untrue and unfair accusations," and that he apologized to

Vision Security and Harris. [Beebe Decl. ¶ 5 & Exh. "1" thereto.] In addition, three individuals

representing themselves as former Vision Security employees or sales representatives, posted

rebuttals to the Rees Post stating, among other positive things, that the company "treated me very

fairly and paid me on time," that "I was always paid in a timely manner and NEVER did I not

receive pay for work performed," that customers "[were] super pleased with [Vision Security's]

---

[2] A true and correct copy of the Rees Post, together with rebuttals and comments thereto, is attached hereto as Exhibit "A."

services," and that the company "treated [me] very well . . . and paid every dime I was owed." [*Id.* ¶ 5 & Exh. "1" thereto.]  Two others posted negative reviews of Vision Security.  [*Id.*]

### Free Online Public Forums Like Ripoff Report Provide an Important Public Service

Ripoff Report, and online platforms like it, fulfill an important societal function by allowing individual consumers with few resources to have a voice and enabling them to cast light on questionable business practices.[3]  To further this goal, Xcentric has adopted several important policies and practices.

First, Xcentric requires that consumers who post information on Ripoff Report affirm that the information they are posting is truthful and accurate—in no way does Ripoff Report solicit or encourage the development of false or defamatory content.

Second, and contrary to Vision Security's allegations, Xcentric offers businesses several ways to address negative reports, including the ability to post positive rebuttals free of charge, a fact Vision Security and Harris were well aware of at the time they filed their Complaint.

Third, Xcentric offers a fee-based program for businesses that are committed to resolving each and every consumer complaint in a full and fair manner and addressing systemic problems at the root of the complaints.  The program—called the Corporate Advocacy Business Remediation & Customer Satisfaction Program ("Corporate Advocacy Program" or "CAP")—

---

[3] Ripoff Report also benefits consumers by working closely with all levels of federal, state, and local law enforcement, including but not limited to, various state attorneys general, local and federal prosecutors, Homeland Security, the United States Justice Department, US Customs and Border Patrol, the United States Secret Service, FBI, FTC, SEC, U.S. Postal Inspectors, and local police, and providing them with information used to locate victims, detect patterns of deceptive business practices, and prosecute violations of consumer protection laws, among other things. [Declaration of Ed Magedson Decl., filed concurrently herewith, ¶ 3(f); *see also* Beebe Decl., ¶ 7 & Exh. "2" thereto at XC000408.]

offers businesses an effective way of rehabilitating their online reputations *if* they are willing to do the hard work that is necessary to address consumer complaints.

<u>Finally</u>, Xcentric's policy of refusing to remove negative reports ensures not only that consumers are not bullied or bribed into recanting, but also that they are given access to all of the information—the "full story" if you will—regarding a particular complaint and whether and how it was resolved by the business.

These policies and practices are briefly described below.

## **<u>Reports Must be True and Accurate</u>**

Contrary to Vision Security's allegations, Xcentric does not allow consumers to post false or defamatory content, much less solicit or encourage false or defamatory content. Instead, consumers like Rees agree—not just once, but *twice* before posting a report—to post only information that is truthful and accurate. [Beebe Decl. ¶¶ 8-10 & Exhs. "3" and "4" thereto.] At the time a consumer initially opens an account on Ripoff Report (a necessary precursor to posting a report), the consumer agrees to Xcentric's Terms of Service, which state "You will NOT post on ROR [Ripoff Report] any defamatory or illegal material . . . . You will use ROR in a manner consistent with any and all applicable laws and regulations. By posting information on ROR, you warrant and represent that the information is truthful and accurate." [*Id*. ¶ 8 & Exh. "3" thereto at § 5.] In addition, prior to posting a report, a consumer must physically check a box that states "I have read, understood, and agree to Ripoff Report's Terms of Service. By posting the Report/Update/Rebuttal (hereinafter the "Post") I attest that this Post is valid and in compliance with the Online Conduct and other requirements set forth in the Terms of Service." [*Id*. ¶ 9 & Exh. "4" thereto.]

## Ripoff Report Offers Several Options for Addressing Negative Reports

Ripoff Report allows businesses to post positive rebuttals entirely free of charge.  [Beebe Decl. ¶ 11; *see also id.* at ¶ 7 & Exh. "2" thereto at XC000406; *id.* ¶ 16 & Exh. "5" thereto at XC000041.]  Vision Security knew this.  In two separate email exchanges between Harris and Ed Magedson, the founder of Ripoff Report, which occurred prior to the filing of the Complaint, Magedson made it crystal clear that positive posts are not only allowed, they are encouraged and cost the business nothing.  In the first email exchange, in June 2012, Magedson wrote: "Did you first try to file a pleasant/consumer friendly rebuttal to each report? . . . (If your answer is NO, . . *you should immediately post a rebuttal to each report*."  [Declaration of Ed Magedson ("Magedson Decl."), filed concurrently herewith, ¶ 6 & Exh. "1" thereto (emphasis added).]

Harris replied: "I have heard varying responses as to whether a rebuttal is good or bad to do.  I feel inclined to but have been concerned that it will only draw more attention to the report in searches."  [*Id.*]

Within hours of receiving Harris's reply, Magedson wrote back:

Dear ROB … First .. the way you responded to this question ..!.. [quotes the question and Harris's response] This is so wrong … *do not delay … file a good, non-combative rebuttal* .. Be nice and respond as well as you did to your questions below - - this only shows what a great company you are ..! Whoever told you not to respond is either an SEO company or, someone who thinks they know how the Internet works. If you think it makes Ripoff Report stronger, obviously that is not the case because the listings are still there ..you not saying your side is wrong. *Let anyone willing to read, hear it straight from you. This is free to you..take advantage of it. We always urge all our members to respond to their reports. . . .*

[*Id.* (emphasis added).]  In a subsequent email exchange, in July 2013, Magedson again made it clear that businesses are encouraged to post a positive rebuttal to a negative report.  [*Id*. ¶ 7 & Exh. "2" thereto.]

x

In fact, Ripoff Report advertises this free option, including the ability to upload documents or other evidence that supports a positive rebuttal, in several places on its website:

> *[I]f you have been the subject of a negative Report, we do offer free alternatives. We charge nothing whatsoever to anyone who wishes to submit [a] response/rebuttal to a Report*, including uploading documents/images in support of that response/Rebuttal. . . . *[W]e always permit companies or individuals to submit a free Rebuttal* (including posting copies of any evidence that supports their story). . . . (See the RESPOND rebuttal box at the end of the specific Ripoff Report you wish to comment on.)

[Beebe Decl. ¶ 16 & Exh. "5" thereto at XC000041 (emphasis added); *see also id.* ¶ 7 & Exh. "2" thereto at XC000406.]  Despite this free option, and Magedson's advice to take advantage of it, neither Vision Security nor Harris have ever posted a positive rebuttal to the Rees Post.

In addition to a free, positive rebuttal, a business that is the subject of a negative report may sue the author of the report directly and attach any court findings or judgment as a rebuttal to a negative report—again at no charge.  [*Id*. ¶¶ 12-13.]  In instances where a court makes considered findings based on evidence, Xcentric may also exercise its editorial discretion to redact false statements from reports based on the court's findings or feature the court's findings in a prominent place in connection with a report.  [*Id.* ¶ 13.][4]

Another option is to dispute a report using Xcentric's VIP Arbitration program.  [*See id.* ¶¶ 15-17 & Exhs. "5" and "6" thereto.]  Xcentric's independent arbitrator panel currently consists of a retired Arizona Court of Appeals judge and a seasoned arbitrator who has been arbitrating matters since 1987, including years of experience with the American Arbitration

---

[4] While Xcentric generally will not disclose the identity of the author of a particular report—to protect that individual's First Amendment right of anonymous speech—when a business meets the requisite legal standard under Arizona law, Xcentric will provide the author's identity and related information in response to a lawfully issued subpoena.  [Beebe Decl. ¶ 14.]

Association.  [*Id.* ¶ 15.]  Under the VIP Arbitration program, the arbitrator reviews evidence provided by both parties pursuant to program-specific rules.  [*See id.* ¶¶ 16-17 & Exhs. "5" and "6" thereto.]  If the arbitrator determines the report at issue contains false statements of fact, or otherwise violates Xcentric's Terms of Service, Xcentric will redact those portions of the report, although opinions and true statements will remain.  [*See id.* ¶ 16 & Exh. "5" thereto at XC000040; *id.* ¶ 17 & Exh. "6" thereto.]  Xcentric charges a minimal fee (approximately $2,000) for the VIP Arbitration program, almost all of which is used to pay the independent arbitrator and other costs associated with administering the program.  [*Id.* at ¶ 15; *see also id.* at ¶ 16 & Exh. "5" thereto at XC000041; *id.* ¶ 17 & Exh. "6" thereto.]

Finally, a business may choose to enroll in Xcentric's Corporate Advocacy Business Remediation & Customer Satisfaction Program ("CAP").

## Xcentric's Consumer Advocacy Program "CAP"

CAP is a comprehensive customer-service-oriented program that allows a company like Vision Security to rehabilitate its online reputation by making a significant commitment to customer service.  [Beebe Decl. ¶¶ 18, 24 & Exh. "7" thereto ("[CAP] does a lot for consumers and businesses alike.  We can help you regain control over your operational, organizational and other issues that generate the majority of complaints.  Of course, you have other options [including filing free rebuttals] . . . But if you want to increase your customer satisfaction and solidify your online reputation, then CAP can help.").]

One of the first steps a CAP member takes is to resolve each and every existing consumer complaint on Ripoff Report to the customer's satisfaction.  [Beebe Decl. ¶ 19; *see also* Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000146; *id.* ¶ 7 & Exh. "2" thereto at XC000166.]

The next step requires the business to resolve any new consumer complaints quickly, fully, and fairly.  [Beebe Dec. ¶¶ 20, 26 & Exh. "9" thereto at XC000019.]  Upon posting or attempting to post a complaint, the consumer receives a letter stating that the business will make "every possible effort to correct the problem quickly and satisfy" the complainant.  [*Id*. ¶ 20; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000158-163.]  The business must then respond to the complaint and resolve it, if possible, within 7-14 business days.  [Beebe Decl. ¶ 20; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000151; *id.* ¶ 7 & Exh. "2" thereto at XC000173.] Consumers are encouraged to email Magedson with an update "so that we can keep abreast of how things are going."  [Beebe Decl. ¶ 20; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000158-163.]

In addition, the business undergoes an investigative review designed to help it identify the potential source of complaints and help ensure the business takes active steps to remedy the problem.  [Beebe Decl. ¶ 21; *see also id.* ¶ 25 & Exh. "8" thereto at XC000056; *id.* ¶ 26 & Exh. "9" thereto at XC000019-20; *id.* ¶ 27 & Exh. "10" thereto; Magedson Decl. ¶ 7 & Exh. "2" thereto at XC000166.]  Among other things, Xcentric sends an independent professional to do an on-site inspection of the business, which includes taking photos and interviewing both management and employees to learn about the new CAP member's business operations.  [*Id.*] This typically occurs within 48–72 hours after a business enrolls in CAP.  [*Id.*]  Further, the business is asked to outline the positive changes it makes to avoid future complaints and provide this information to Xcentric.  [Beebe Decl. ¶ 21; *id.* ¶ 25 & Exh. "8" thereto at XC000056; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000146.]

Importantly, as a matter of general policy, negative reports are ***not*** removed from Ripoff Report for CAP members, even after a complaint is resolved to the customer's satisfaction or at the request of a CAP member.  [Beebe Decl. ¶¶ 23, 25 & Exh. "8" thereto at XC000057; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000150.]  Xcentric's reasoning is that both consumers and businesses benefit when consumers have all of the relevant information regarding a complaint, including the original negative report and any rebuttals conveying the business's efforts to resolve it.  [Beebe Decl. ¶¶ 23, 25 & Exh. "8" thereto at XC000057.]  Instead, according to the terms of the CAP agreement, Xcentric appends to the negative report a positive statement regarding the business's commitment to customer service and issues a new, positive title that reiterates the company's commitment to customer satisfaction.  [Beebe Decl. ¶ 22; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000147; *id.* ¶ 7 & Exh. "2" thereto at XC000167.]

Of course, CAP costs money—it requires not only a commitment from the business but also a commitment from Xcentric, who works hand-in-hand with the CAP member not only to ensure existing and future consumer complaints are resolved quickly and to the customer's satisfaction, but also to implement system-wide changes within the business that help it avoid complaints altogether, resulting in significant administrative costs to Xcentric.[5]  But CAP is worth it, providing a tremendous benefit to both businesses and consumers alike, which Xcentric is uniquely positioned to provide.

---

[5] While Xcentric has a general pricing structure for CAP, the membership fee for a particular CAP member is based a variety of factors, including its size, the number of complaints it has received, and its budget.  Xcentric offers special reduced rates to small businesses and businesses operating on a limited budget.  [*See* Beebe Decl. ¶ 28.]

## Xcentric's Policy of Not Removing Reports
## Furthers Its Purpose of Serving Consumers

As one can imagine, most complaints on Ripoff Report concern businesses, which generally have more financial resources than the consumers who wish to complain about them. In light of this imbalance, Xcentric has adopted a policy of not removing any negative reports (although it will redact portions of a report in certain circumstances, as described above) to protect consumers from businesses who may "throw their weight around"—threaten, coerce, or bribe—to silence critics. [Beebe Decl. ¶ 23.] Xcentric's non-removal policy applies across-the-board, including to removal requests from the original author, because Xcentric recognizes that authors are particularly vulnerable to being bullied or bribed to submit such requests. [*See id.*][6]

Xcentric's "mission" is to "empower consumers," "defend the First Amendment," and "expose wrongdoing." [*Id.* ¶ 30; Magedson Decl. ¶ 7 & Exh. "2" thereto at XC000177.] In an effort to further that mission, Xcentric subscribes to Justice Louis Brandeis's famous statement that the remedy for bad speech is "more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377, 47 S. Ct. 641, 649 (1927) (Brandeis, J., concurring). The overarching principle of Ripoff Report is to educate and inform the public by providing more information, not less. Accordingly, Xcentric will not "hide" or remove a report, unless (as explained above) a court or VIP arbitrator finds that certain statements are in fact false and defamatory, in which

---

[6] This case is no exception. On September 17, 2013, Rees signed an Affidavit ("Rees Affidavit"), prepared by Vision Security, in which he purports to recant several of the statements he made in the Rees Post and states that he would like Ripoff Report to remove the Rees Post. [Dkt. 68, First Amended Complaint ("Complaint"), a true and correct copy of which is attached hereto as Exhibit B, ¶ 29 & Exh. "A" thereto.] That same day, Rees not only also signed an agreement to work for Vision Security during its upcoming sales season, he received an advance of $1,000. [Declaration of Rachel L. Wertheimer, filed concurrently herewith, ¶ 4 & Exhs. "9," "10," and "11" thereto.]

case those statements may be redacted.  [Beebe Decl. ¶¶ 23, 25 & Exh. "8" thereto at XC000057; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000150.]

Xcentric takes care to ensure that consumers who post negative reports are aware of its non-removal policy.  Xcentric's Terms of Service, to which users must agree before creating an account on Ripoff Report (a necessary precursor to posting a report or rebuttal), state that "ROR [Ripoff Report] is a permanent record of disputes, including disputes which have been fully resolved.  In order to maintain a complete record, information posted on ROR will not be removed.  By posting information on ROR, you understand and agree that the material you post will become part of ROR's permanent record and will NOT be removed even at your request." [Beebe Decl. ¶ 8 & Exh. "3" thereto at § 5.]  In addition, just prior to submitting a report or rebuttal, the user must check a box that states "I have read, understood, and agree to Ripoff Report's Terms of Service.  By posting the Report/Update/Rebuttal (hereinafter the "Post") I attest that this Post is valid and in compliance with the Online Conduct and other requirements set forth in the Terms of Service."  [*Id.* ¶ 9 & Exh. "4" thereto.]

The first time that Xcentric became aware of the Rees Affidavit, in which Rees purports to recant some of the statements in the Rees Post, was when Vision Security's Complaint (to which the Affidavit was attached) was served upon Xcentric.  [Beebe Decl. ¶ 6; Magedson Decl. ¶ 5.]  To the best knowledge of Xcentric, at no time did Rees ever contact Xcentric and request that it remove the Rees Post from the Ripoff Report website or provide the Affidavit to Xcentric. [Beebe Decl. ¶ 6; Magedson Decl. ¶¶ 4-5.]

## Vision Security's History of Deceptive Business Practices

Vision Security is exactly the type of company that Ripoff Report was designed to expose. In at least twelve of the fifteen states in which Vision Security does (or did) business, it has been formally disciplined by government regulatory authorities. [Declaration of Rachel L. Wertheimer ("Wertheimer Decl."), filed concurrently herewith, ¶ 5 & Exhs. "12-19" thereto; *id.* ¶ 6 & Exh. "20" thereto at Plaintiffs' answers to Requests for Admission Nos. 1-3 and Interrogatory No. 5; *see also* Magedson Decl. ¶ 7 & Exh. "2" thereto at XC000175 (stating that Vision Security operates in 15 states).] Among other things, Vision Security has been fined tens of thousands of dollars and lost its license for exactly the kinds of deceptive business practices Rees complained of. [*See id.*][7]

For example, in February 2014, Vision Security was fined $30,000 by the Utah Division of Consumer Protection and ordered to cease and desist several "deceptive acts and practices" aimed at Utah consumers. [Wertheimer Decl. ¶ 5 & Exhs. "12" and "13" thereto.] The Utah Division of Consumer Protection had "received numerous complaints against [Vision Security] alleging deceptive sales practices related to [Vision Security's] direct solicitations," including that Vision Security's "sales representatives make untrue statements regarding [Vision Security's] affiliation with third-party companies, the need for service or repair of an existing alarm system from a different provider, or other claims regarding the supplier[] or product[] . . . that are untrue." [*Id.* ¶ 5 & Exh. "13" thereto at Administrative Citation ¶ 4.]

---

[7] Remarkably, in both the June 2012 and July 2013 email exchanges with Magedson, Harris answered "no" to the following question: "Has your company or a related company ever been investigated by a government agency, now or in the past?" [Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000154; *id.* ¶ 7 & Exh. "2" thereto at XC000176.]

In April 2015, Vision Security's license was revoked (although later reinstated and suspended) by the Utah Division of Occupational and Professional Licensing of the Department of Commerce of the State of Utah because of Vision Security's "pattern of making false, misleading, deceptive or fraudulent statements when trying to sell security systems to customers." [Wertheimer Decl. ¶ 5 & Exhs. "12" and "14" thereto.]

Similarly, in August 2015, the Pennsylvania Attorney General fined Vision Security $35,000 and required it to make restitution to Pennsylvania consumers for making false representations during door-to-door sales presentations. [Wertheimer Decl. ¶ 5 & Exhs. "12" and "15" thereto.] Vision Security was accused of convincing consumers to switch from their current home security providers to Vision Security by erroneously informing them that their current security system providers were going out of business or were acquired by Vision Security. [*Id.* ¶ 5 & Exh. "15" thereto at 2.]

Likewise, in February 2014, Vision Security was fined $20,000 by the State of Ohio Attorney General's Office, paid over $2,600 in restitution to Ohio consumers, and agreed to implement new training, policies, and procedures, after the Ohio Attorney General alleged Vision Security violated Ohio's consumer protection laws by making numerous misrepresentations to consumers. [Wertheimer Decl. ¶ 5 & Exhs. "12" and "16" thereto.]

The list goes on. [*See, e.g.*, Wertheimer Decl. ¶ 5 & Exhs. "12" and "17" thereto (fining Vision Security over $18,000 and suspending its sales activities in Florida for two years as a result of complaints of false representations to Florida consumers); *id.* ¶ 5 & Exhs. "12" and "18" thereto (concluding Vision Security engaged in deceptive sales tactics in violation of Idaho consumer protection laws and ordering Vision Security to pay restitution to Idaho consumers and

xviii

implement training, policies, and procedures to avoid future violations); *id.* ¶ 5 & Exh. "12"

thereto at Request for Admission No. 13 (fining Vision Security $10,000 and ordering it to pay

restitution to Missouri consumers and cease door-to-door and telephone solicitations in Missouri

due to deceptive business practices); *id.* ¶ 6 & Exh. "20" thereto at Plaintiffs' response to

Interrogatory No. 5. (Vision Security asked to resolve Indiana consumers' complaints of

deceptive sales tactics and, apparently, temporarily losing its authority to conduct business in

Indiana); *id.* (Maryland investigation due to consumer complaints of misrepresentations by sales

representatives); *id.* (Minnesota investigation prompted by consumer complaints of

misrepresentations); *id.* (licensing issues in North Carolina associated with consumer complaints

against Vision Security's sales representatives); *id.* (voluntary consent order with Tennessee state

authority as a result of an investigation into consumer complaints against Vision Security's door-

to-door sales representatives); *id.* (investigation in Wisconsin spurred by consumer complaints).

     Vision Security's pattern of deceptive business practices is reflected in its "F" rating

with the Utah Better Business Bureau ("BBB"). [Wertheimer Decl. ¶ 5 & Exhs. "12" and "19"

thereto (citing "a pattern of complaints alleging misrepresentation during initial contact with the

sales representative"); *id.* ¶ 6 & Exh. "20" thereto at Plaintiffs answers to Requests for

Admission Nos. 1-3.] The BBB Report shows a whopping 487 complaints against Vision

Security, several of which Vision Security has failed to resolve or even respond to. [Wertheimer

Decl. ¶ 5 & Exhs. "12" and "19".]

     Moreover, just as Rees claimed in the Rees Post, Vision Security's deceptive sales tactics

have landed it in hot water with several competing companies. For example, ADT, LLC

("ADT"), a competing alarm company, filed suit against Vision Security in November 2013,

alleging that "Vision Security methodically trains its sales agents to lie to ADT's customers" and that Vision Security "send[s] sales agents into the field to sell alarm systems using false sales pitches."  [Wertheimer Decl. ¶ 3 & Exh. "1" thereto.]  Specifically, ADT alleged that a regional manager named Brett Harris instructed hundreds of sales representatives of Vision Security during multiple training sessions to locate houses with ADT signs, designating the home of an ADT customer; approach the homeowner and pretend to be a technician "with" an alarm manufacturer "doing business with" ADT; inform the homeowner they were there to provide a free upgrade to the house's alarm system as required by the local fire and police departments; and after replacing the alarm keypad, explain to the homeowner that GE (the manufacturer of the alarm system) prefers Security Networks (for which Vision Security is an agent) over ADT for security monitoring, thereby enticing the homeowner to enter into a contract with Security Networks.  [Wertheimer Decl. ¶ 3 & Exhs. "1-6" thereto.]

Vision Security ultimately paid ADT $2.2 million to settle the case.  [Wertheimer Decl. ¶ 3 & Exh. "7" thereto.]

## STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

## I.     IMMUNITY FROM LIABILITY UNDER 47 U.S.C. § 230

Under Section 230 "[a] defendant is … immune from state law liability if (1) it is 'a provider or user of an interactive computer service'; (2) the complaint seeks to hold the defendant liable as 'a publisher or speaker'; and (3) the action is based on information provided by another information content provider …'."  *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 286, 952 N.E.2d 1011, 1015 (2011); 47 U.S.C. § 230.

Material undisputed facts relevant to this claim:

1.      Xcentric operates the consumer-review website ripoffreport.com ("Ripoff Report"), on which third-parties may post reviews ("reports") about businesses and respond to reports posted by others.  [Beebe Decl. ¶ 4; Complaint ¶ 16.]

2.      On March 4, 2010, Anthony Rees, a third-party user, posted a report on Ripoff Report about his business experience with Vision Security and Harris (the "Rees Post").  [Beebe Decl. ¶ 5; Complaint ¶ 27.]

3.      Vision Security's claims seek to treat Xcentric as the "speaker or publisher" of the Rees Post.  [*See, e.g.*, Complaint ¶¶ 43-44, 47 (Lanham Act claim based on allegations that Xcentric is the publisher of the Rees Post); ¶ 62 (Utah Deceptive Trade Practices Act claim based on allegations that Xcentric is the publisher of the Rees Post); ¶¶ 71-72 (defamation claim, same); ¶¶ 86-88 (tortious interference claim, same); ¶ 105 (claim for declaratory relief, same); ¶ 11 (claim for injunctive relief, same).]

4.      Xcentric requires third-party users who post content on Ripoff Report to agree—two separate times before posting a report—to post only information that is truthful and accurate. [Beebe Decl. ¶¶ 8-9 & Exhs. "3" and "4" thereto.]

5.      There is no evidence that Rees ever contacted Xcentric to tell it that the content of the Rees Post was false and that he wanted it to be removed from Ripoff Report.  [Beebe Decl. ¶ 6; Magedson Decl. ¶¶ 4-5.]

6.      On multiple occasions, Magedson told Vision Security and Harris that positive posts about a company are allowed, encouraged, and free of charge.  [Magedson Decl. ¶¶ 6-7 & Exhs. "1" and "2" thereto.]

7.      Businesses may dispute a negative report using Xcentric's VIP Arbitration Program, for which Xcentric charges a minimal fee (approximately $2,000), almost all of which is used to pay the independent arbitrator and other costs associated with administering the program.  [Beebe Decl. ¶¶ 15-17 & Exhs. "5" and "6" thereto.]

8.      In the event the arbitrator determines that a report contains false statements or otherwise violates Xcentric's Terms of service, Xcentric will redact those portions of the report.  [*See id.* ¶ 16 & Exh. "5" thereto at XC000040; *id.* ¶ 17 & Exh. "6" thereto.]

9.      Likewise, if a court makes considered findings of fact based on evidence, and determines that a statement is false, Xcentric will redact that statement.  [*Id.* ¶ 13.]

10.     Xcentric's Corporate Advocacy Program ("CAP") is one of several options available to businesses that want to rebut negative reports.  With Xcentric's help, CAP members commit to resolve each and every complaint on Ripoff Report, including those that Xcentric has already received, to the customer's satisfaction.  Further, CAP members undergo an investigative review of their business operations to help them detect the potential source of complaints, and are asked to provide an explanation to Xcentric of the changes the business has made to its operations to avoid future complaints.  [*Id.* ¶¶ 18-28 & Exhs. "7, "8," "9," and "10" thereto; *see also* Magedson Decl. ¶¶ 6-7 & Exhs. "1" and "2" thereto.]

11.     Xcentric has a policy that it will generally not remove a negative report (although it will redact portions of a report in certain circumstances, *see* ¶¶ 8-9, *supra*), including negative reports regarding CAP members.  [Beebe Decl. ¶¶ 23, 25 & Exh. "8" thereto at XC000057; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000150.]

12.     The following taglines appear on Ripoff Report: "By consumers, for consumers"; "Don't let them get away with it. Let the truth be known"; and "Complaints Reviews Scams Lawsuits Frauds Reported. File your review. Consumers educating consumers." [Beebe Decl. ¶ 29; Complaint, ¶¶ 21-22.]

13.     Xcentric first became aware of the Rees Affidavit, in which Rees purports to recant some of his statements in the Rees Post, on or about October 2013, when Vision Security's Complaint in this action, to which the Rees Affidavit was attached, was served upon Xcentric.  [Beebe Decl. ¶ 6; Magedson Decl. ¶ 5.]  To the best knowledge of Xcentric, at no time did Rees ever contact Xcentric and request that Xcentric remove the Rees Post from Ripoff Report.  [Beebe Decl. ¶ 6; Magedson Decl. ¶¶ 4-5.]

## II.     DEFAMATION AND LIBEL

A claim for defamation (which includes libel) requires a showing (1) that the Defendant published the statements concerning the Plaintiffs, (2) the statements were false, defamatory, and not subject to any privilege, (3) the Defendant published the statements with the requisite level of fault, and (4) Plaintiffs were damaged as a result of the statements.  *West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994).

Material undisputed facts relevant to this claim:

1.     *See* material undisputed facts relevant to "Immunity from Liability Under 27 U.S.C. § 230," *supra.*

## III.     TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

The elements of a claim for tortious interference with prospective economic relations are: (1) the Defendant intentionally interfered with Plaintiffs' potential economic relations (2) by

xxiii

improper means (3) causing injury to Plaintiffs.  *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015).

Material undisputed facts relevant to this claim:

1.      *See* material undisputed facts relevant to "Immunity from Liability Under 27 U.S.C. § 230," *supra.*

## IV.   VIOLATION OF UTAH'S DECEPTIVE TRADE PRACTICES ACT, UTAH CODE § 13-11a-3

A party commits a "deceptive trade practice" when any one of a laundry list of offenses is undertaken. Utah Code § 13-11a-3.  Vision Security does not specify which of these offenses Xcentric is alleged to have committed.  Based upon Paragraphs 55-64 of the Complaint, Vision Security appears to rely on Utah Code § 13-11a-3(1)(b) & (h), which provide that

> (1) Deceptive trade practices occur when, in the course of a person's business, vocation, or occupation that person:
> . . .
>
> (b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> . . .
>
> (h) disparages the goods, services, or business of another by false or misleading representation of fact . . . .

Material undisputed facts relevant to this claim:

1.      *See* material undisputed facts relevant to "Immunity from Liability Under 27 U.S.C. § 230," *supra.*

## V.    VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A)(1)

The relevant portion of the Lanham Act states as follows:

(1) Any person who on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act § 43(a), 15 U.S.C. §1125(a)(1).

<u>Material undisputed facts relevant to this claim:</u>

1.      *See* material undisputed facts relevant to "Immunity from Liability Under 27 U.S.C. § 230," *supra.*

# ARGUMENT

Summary judgment is appropriate when there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue exists as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  The court views the evidence in "the light most favorable to the non-moving party" and draws all reasonable inferences in its favor.  *Enterprise Mgmt. Ltd., Inc. v. Warrick*, 717 F.3d 1112, 1117 (10th Cir. 2013).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A fact is material only if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Thus, "when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250 (quotation and footnote omitted).

All of Vision Security's claims are barred by Section 230 of the Communications Decency Act ("Section 230") because they seek to hold Xcentric liable for allegedly false and defamatory content in the Rees Post—content which Rees alone provided, without any encouragement, solicitation, or input from Xcentric.  In addition, Vision Security's claims based on the Utah Deceptive Trade Practices Act and the federal Lanham Act fail for the additional

reason that there is no commercial speech or likelihood of confusion that could possibly serve as the basis for such claims.  As a result, summary judgment is appropriate.

**I.   XCENTRIC IS ENTITLED TO SUMMARY JUDGMENT ON ALL VISION SECURITY'S CLAIMS BECAUSE THEY ARE ALL BARRED BY SECTION 230.**

Vision Security's claims fail as a matter of law because they require this Court to impute publication of Rees's third-party posts to Xcentric—an imputation prohibited by Section 230 of the Communications Decency Act ("Section 230").  Recognizing the value in promoting free speech on internet forums, Congress passed Section 230 in 1996 to protect "interactive computer service[s]" from liability for providing these types of forums.  *See* 47 U.S.C. § 230.  "Section 230 creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party."  *Ben Ezra, Weinstein, & Co., Inc. v. America Online Inc.,* 206 F.3d 980, 984–85 (10th Cir. 2000).

Specifically, Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see also id.* at (e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.").  Essentially, Section 230 bars a party from attempting to impute liability to the provider of an interactive computer service, like Xcentric, where the allegedly injurious content was provided by a third party, like Rees.  *See, e.g.*, *Ben Ezra*, 206 F.3d at 986; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 254 (4th Cir.2009) (Section 230 "bar[s] state-law plaintiffs from holding interactive computer service providers legally

responsible for information created and developed by third parties."); *Johnson v. Arden,* 614 F.3d 785, 791 (8th Cir.2010) (same).

Under Section 230 "[a] defendant is … immune from state law liability if (1) it is 'a provider or user of an interactive computer service'; (2) the complaint seeks to hold the defendant liable as 'a publisher or speaker'; and (3) the action is based on information provided by another information content provider …'." *Shiamili v. Real Estate Grp. of New York, Inc.*, 17 N.Y.3d 281, 286, 952 N.E.2d 1011, 1015 (2011). All three elements are met in this case. <u>First</u>, there is no dispute that Xcentric provides an interactive computer service—Ripoff Report. <u>Second</u>, there is no dispute that Vision Security's claims seek to treat Xcentric as a "speaker or publisher." <u>Third</u>, there is no genuine dispute of material fact that Vision Security's claims are based on information provided entirely by Rees, a third party information content provider, without solicitation, encouragement or input from Xcentric. Accordingly, Vision Security's claims are barred by Section 230.

A.    <u>There is No Dispute the First Two Elements of Section 230 are Met Here.</u>

There can be no dispute that Xcentric is a provider of an interactive computer service— Ripoff Report—or that the Complaint seeks to hold Xcentric liable as the publisher or speaker of the Rees Post. Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230 (f)(2). "The prototypical service qualifying for this statutory immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997). As numerous courts have held, and Vision Security

does not dispute, in operating Ripoff Report—an online forum on which consumers post comments about businesses, and consumers and businesses alike respond to those comments— Xcentric meets the definition of a provider of an interactive computer service.  [Beebe Decl. ¶ 4; Complaint ¶ 16].  *See also e.g., Zeran,* 129 F.3d at 330-31; *Whitney Info. Network Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, *8 (M.D. Fla. 2008).

Likewise, there can be no dispute that Vision Security's claims seek to treat Xcentric as the "speaker or publisher" of the Rees Post.  [*See, e.g.*, Complaint ¶¶ 43-44, 47 (Lanham Act claim based on allegations that Xcentric is the publisher of the Rees Post); ¶ 62 (Utah Deceptive Trade Practices Act claim based on allegations that Xcentric is the publisher of the Rees Post); ¶¶ 71-72 (defamation claim, same); ¶¶ 86-88 (tortious interference claim, same); ¶ 105 (claim for declaratory relief, same); ¶ 11 (claim for injunctive relief, same)].  *See also Ben Ezra,* 206 F.3d at 983, 986 (America Online immune under Section 230 from liability for defamation predicated on its publication of incorrect information regarding defendant's stock price, which America Online obtained from a third party); *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, at *9 (M.D. Fla. 2008) (Plaintiff's "defamation claim treats Defendants as the publisher of the allegedly defamatory statements made against WIN on the [Ripoff Report] website."); *Schneider v. Amazon.com, Inc.* 108 Wash. App. 454, 31 P.3d 37 (2001) (rejecting argument that tortious interference claim did not treat Amazon as a publisher).

Accordingly, the first two elements necessary for Section 230 immunity are satisfied. The key issue in this case is whether the third element is met—whether Vision Security's claims are based on information provided by another information content provider.  For the reasons

discussed below, the answer is unequivocally yes and, therefore, all of Vision Security's claims

are barred by Section 230 as a matter of law.

> **B.**     **There is No Genuine Dispute that Vision Security's Claims Are Based on Information Provided Entirely By Another Information Content Provider.**

Xcentric is not an information content provider with respect to the Rees Post because

Xcentric did not specifically encourage development of the allegedly false and defamatory

statements made in the Rees Post.

> **1.**     **There is No Evidence Xcentric Solicited or Encouraged Rees (Or Any Other Third-Party User) to Post False and Defamatory Content on Ripoff Report.**

As a general matter, Section 230 expressly prohibits courts from imputing liability to a

website host for content posted by another party.  47 U.S.C. § 230(c)(1) ("No provider or user of

an interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider."); *see also Ben Ezra*, 206 F.3d at 984–85

(Section "230 creates a federal immunity to any state law cause of action that would hold

computer service providers liable for information originating with a third party."); *Doe v.

Myspace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008) ("Parties complaining that they were harmed

by a Web site's publication of user-generated content . . . may sue the third-party user who

generated the content, but not the interactive computer service that enabled them to publish the

content online."); *Almeida v. Amazon.com, Inc.,* 456 F.3d 1316, 1321 (11th Cir. 2006) ("The

majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any

cause of action that would make service providers liable for information originating with a third-

party user of the service.'" (quoting *Zeran,* 129 F.3d at 330)).

In very limited circumstances, however, providers may be liable for content posted by a third-party, but only if the provider in some way specifically encourages development of what is offensive about the content. "The CDA defines the term *information content provider* as 'any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.'" *F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1197 (10th Cir. 2009) (quoting 47 U.S.C. § 230(f)). The Tenth Circuit has held that, under this definition, a service provider is an information content provider "if it in some way specifically encourages development of what is offensive about the content." *Id.* at 1199.

In *Accusearch*, the offending content was confidential personal information, including telephone records, obtained from third parties and posted by Accusearch on its website. *See id.* The court held that Accusearch was responsible for the development of that content, and therefore liable as an information content provider, because Accusearch "solicited requests for confidential information protected by law, paid researchers to find it, knew that the researchers were likely to use improper methods, and charged customers who wished the information to be disclosed." *Id.* at 1199, 1201.

The *Accusearch* court distinguished that case from the court's previous decision in *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980 (10th Cir. 2000), in which the court held that America Online was not an information content provider. The plaintiff in *Ben Ezra* sued America Online for posting incorrect information regarding the plaintiff's stock price and share volume, which America Online purchased from a third-party vendor. 206 F.3d at 983. The court held that America Online was protected from liability under Section 230 of the CDA

because "Plaintiff has not demonstrated [that America Online] worked so closely with [the third-party vendor] regarding the allegedly inaccurate stock information that [it] became an information content provider."  *Id.* at 985-86.  The *Accusearch* court held that the difference between Accusearch and America Online was that the claim against America Online "was based on *inaccuracies* in the solicited quotations," which meant that the "offending content" at issue was "erroneous stock quotations and, unsurprisingly, America Online did not solicit the errors; indeed it sent the vendor emails requesting that it 'correct the allegedly inaccurate information.'" *Accusearch*, 570 F.3d at 1199 (quoting *Ben Ezra*, 206 F.3d at 985)).  In other words:

> In *Ben Ezra* . . . America Online had done nothing to encourage what made the content offensive – its alleged inaccuracy.  America Online's conduct was neutral with respect to possible errors in the stock quotations. It was therefore not *responsible* for the offensive content.

> *Accusearch*, 570 F.3d at 1199-1200; *see also Fair Housing Council v. Roommates.com*,

521 F.3d 1157, 1166-68 (9th Cir. 2008) (holding that a service provider that *requires* its users to disclose illegal discriminatory preferences is liable as an information content provider: "a website helps to develop unlawful content, and thus falls within the exception to Section 230, if it contributes materially to the alleged illegality of the conduct"); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) (holding that a service provider was not liable as an information content provider for defamatory content posted by a third-party where it did nothing to encourage defamation or to make defamation easier); *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 410 (6th Cir. 2014) ("A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful.").

7

Here, Vision Security's claims against Xcentric are based on allegedly false and defamatory statements made in the Rees Post, which means that the "offending content" at issue is the allegedly false and defamatory statements. Unlike in *Accusearch*, however, here there is no evidence Xcentric solicited, let alone paid, Rees (or any other third-party users) to post false and defamatory reports on Ripoff Report or knew that false and defamatory content would be posted. Instead, similar to America Online in *Ben Ezra*, Xcentric made every effort to ensure that third-party content posted on Ripoff Report was *not* false and defamatory by requiring users to agree—two separate times before posting a report—to post only information that is truthful and accurate. [Beebe Decl. ¶¶ 8-9 & Exhs. "3" and "4" thereto.] Accordingly, Xcentric is not responsible for the allegedly offensive content in the Rees Post and remains entitled to immunity under Section 230.[8]

> **2.      Xcentric's Refusal to Remove the Rees Post is an Exercise of Its Traditional Editorial Functions, For Which Xcentric Retains Section 230 Immunity**.

---

[8] Unfortunately, Xcentric has repeatedly been sued in connection with third-party posts on Ripoff Report in an attempt to suppress negative reports. As a result, Xcentric has repeatedly and successfully defended against similar claims by asserting its Section 230 immunity. *See, e.g.*, *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173, *6, 7, 13 (N.D. Tex. 2009) (Xcentric not an information content provider under Section 230); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273, at *7 (N.Y. Sup. 2009) ("[T]o the extent that the third cause of action is premised upon statements made by Milewski and/or other users of Ripoff Report, Xcentric is protected by [Section 230 of] the Communications Decency Act."); *Whitney Info. Network Inc. v. Xcentric Ventures, LLC*, 2008 WL 450095, *8-9, 11-12 (M.D. Fla. 2008) (Xcentric immune from liability under Section 230 from defamation claim based on post on Ripoff Report by third-party user); *Herman v. Xcentric Ventures, LLC*, Case No. 1:10-cv-00398 (N.D. Ga. Feb. 12, 2011) ("Since the CDA was enacted in 1996, every state and federal court that has considered the merits of a claim against the Ripoff Report has, without exception, agreed that [Xcentric is] entitled to immunity under the CDA for statements posted by third-party users.")

Xcentric's refusal to remove the Rees Post does not defeat its Section 230 immunity.  The clear weight of authority, including Tenth Circuit law, holds that an interactive service provider's failure or refusal to remove content, even at the request of the author and even if the content is potentially defamatory, is the exercise of a traditional editorial function and does not strip the provider of its immunity under Section 230.  *See, e.g.*, *Shrader v. Beann*, 503 F' Appx. 650 (10th Cir. 2012) (owner/operator of internet trade website retained immunity under Section 230 from liability for defamation, false-light invasion of privacy, intentional infliction of emotional distress, and civil conspiracy claims arising out of owner/operator's failure to remove an email from the website after learning it was defamatory); *Zeran*, 129 F.3d at 330, 333 (interactive computer service providers retain immunity under Section 230 even upon notice of the existence of defamatory content on their services because the CDA bars lawsuits seeking to hold providers liable for the exercise of a wide range of traditional editorial functions, including deciding whether to publish, withdraw, postpone or alter content); *Ben Ezra*, 206 F.3d at 984-85 (Section 230 protects web operators from liability for exercising their self-regulatory and editorial functions).[9]

---

[9] *See also Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014) (providers cannot "be found to have materially contributed to . . . defamatory content through the decision not to remove the posts"); *Mmubango v. Google, Inc.*, 2013 WL 664231, *3 (E.D. Pa. 2013) ("Google cannot be held liable for failing to withdraw this statement once it has been published."); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 2007 WL 2949002, *3-4 (D. Ariz. 2007) (Xcentric is protected by Section 230 immunity even when it refuses to remove allegedly defamatory material provided by a third-party: "The three allegedly defamatory statements at issue were written by Spencer Sullivan, not defendant.  Plaintiff contends, however, that defendant [Xcentric] 'adopted' Sullivan's statements by failing to remove them after Sullivan disavowed their contents and asked that they be taken down, and that this 'adoption' is tantamount to creation or development.  Yet it is well established that notice of the unlawful nature of the content provided is not enough to make it the website operator's own speech. . . . [Xcentric's] failure to remove the three statements was an exercise of a publisher's

9

   That conclusion makes perfect sense in light of the purposes for which Congress granted

Section 230 immunity in the first place:

> If computer service providers were subject to . . . liability [for not removing
> defamatory content], they would face potential liability each time they receive
> notice of a potentially defamatory statement—from any party, concerning any
> message.  Each notification would require a careful yet rapid investigation of the
> circumstances surrounding the posted information, a legal judgment concerning
> the information's defamatory character, and an on-the-spot editorial decision
> whether to risk liability by allowing the continued publication of that information.
> Although this might be feasible for the traditional print publisher, the sheer
> number of postings on interactive computer services would create an impossible
> burden in the Internet context. . . . Because service providers would be subject to
> liability only for the publication of information, and not for its removal, they
> would have a natural incentive simply to remove messages upon notification,
> whether the contents were defamatory or not. . . . Thus . . . liability upon notice
> has a chilling effect on the freedom of Internet speech. . . . Because the probable
> effects of . . . liability on the vigor of Internet speech and on service provider self-
> regulation are directly contrary to § 230's statutory purposes, we will not assume
> that Congress intended to leave liability upon notice intact.

*Zeran*, 129 F.3d at 333 (citations omitted); *see also id.* at 331 ("The specter of tort liability in an

area of such prolific speech would have an obvious chilling effect.  It would be impossible for

service providers to screen each of their millions of postings for possible problems.  Faced with

potential liability for each message republished by their services, interactive computer service

providers might choose to severely restrict the number and type of messages posted.  Congress

considered the weight of the speech interests implicated and chose to immunize service providers

to avoid any such restrictive effect.").  In short, Xcentric is protected from liability under Section

---

traditional editorial functions and does not defeat CDA immunity." (internal quotations and
alterations omitted)).

230 even if it refused to remove content that Rees indicated was false and wanted to have removed.[10]

It is worth mentioning that Xcentric's reasons for its non-removal policy go beyond sheer logistics.  Xcentric is committed to ensuring that consumers have a voice and that businesses with unscrupulous and undesirable business practices are exposed.  [*See* Beebe Decl. ¶ 23.] Refusing to remove negative posts helps ensure that consumers are not bullied, threatened, coerced or bribed by companies with more money and power that wish to have negative reports removed.  [*Id.*]  The policy also ensures that consumers reviewing reports on Ripoff Report are able to review both negative reports and positive rebuttals and make their own determinations as to a business's conduct and commitment to customer service.  [*Id.*]

3.   **Xcentric's Corporate Advocacy Program is Not Evidence that Xcentric Solicited or Encouraged Rees (Or Any Other Third-Party User) to Post False and Defamatory Content on Ripoff Report.**

At the motion to dismiss stage, Judge Waddoups was required to accept as true Vision Security's allegations that Xcentric's webmaster told Vision Security that positive posts about a company are not allowed and that Vision Security's only option for addressing a negative report like the Rees Post was to pay a "large fee" to join the CAP.  [Dkt. No. 53, Order Denying Motion to Alter Judgment (August 27, 2015) ("Order"), a true and correct copy of which is attached hereto as Exhibit C, at 5.]  However, neither of those allegations is true.

---

[10] Although legally immaterial, it should be noted that, contrary to their allegations, which Judge Waddoups was constrained to accept at the motion to dismiss stage, there is no evidence that Rees ever contacted Xcentric and requested that his post be removed.  [Beebe Decl. ¶ 6; Magedson Decl. ¶¶ 4-5.]

The uncontroverted evidence shows that Magedson made it clear to Harris on multiple occasions that positive posts about or from a business are not only allowed, but encouraged and free of charge.  [Magedson Decl. ¶¶ 6-7 & Exhs. "1" and "2" thereto.]  The contrary allegations in Vision Security's Complaint are false, and Vision Security and Harris knew so before filing their Complaint.  [*Id.*]

Likewise, Vision Security's allegation that its only option for addressing a negative report like the Rees Post is to pay a "large fee" to join Xcentric's Corporate Advocacy Program is also untrue.  As explained above, businesses have several options for addressing negative reports, including posting a positive (and free) rebuttal, suing the author of the report, and using Xcentric's VIP Arbitration program.  [Beebe Decl. ¶¶ 11-17 & Exhs. "5" and "6" thereto.]  And businesses who need and wish to fully rehabilitate their online reputation may enroll in CAP, but enrollment is not required to post a free rebuttal to a post on Ripoff Report.  [*See, e.g.*, Beebe Decl. ¶¶ 18-28 & Exhs. "7-10" thereto.][11]

In sum, there is nothing about CAP, or any other program offered by Xcentric to address negative reports, that strips Xcentric of its Section 230 immunity.

4.    **Ripoff Report's Taglines Did Not Solicit or Encourage Rees (Or Any Other Third-Party User) to Post False and Defamatory Content on Ripoff Report.**

Finally, Vision Security's suggestion that certain taglines that appear on Ripoff Report somehow solicited or encouraged the offensive content in the Rees Post is without legal merit.

---

[11] As explained above, Xcentric's non-removal policy is the same regardless of whether a business is a CAP member.  Negative reports are *not* removed from Ripoff Report, even for CAP members.  [Beebe Decl. ¶¶ 23, 25 & Exh. "8" thereto at XC000057; Magedson Decl. ¶ 6 & Exh. "1" thereto at XC000150.]

[*See* Order, at 4-5; Complaint ¶¶ 21-22.]  At the motion to dismiss stage, Vision Security relied

upon the taglines "By consumers, for consumers"; "Don't let them get away with it. Let the truth

be known"; and "Complaints Reviews Scams Lawsuits Frauds Reported. File your review.

Consumers educating consumers" for this argument.

When the taglines are considered under the correct legal standard—whether they

encourage the posting of false and defamatory content—it is clear that they do not.[12]  Far from

encouraging false and defamatory content, the taglines *discourage* it.  One of the taglines states

"Don't let them get away with it. *Let the truth be known"*—an obvious invitation to post truthful

content—and another states "Consumers educating consumers," indicating that only statements

that will serve to educate other consumers, i.e., true and accurate statements, are welcome.  *See*

*Jones*, 755 F.3d at 416 (noting that the "name of the website, www.TheDirty.com, [does not]

suggest that only illegal or actionable content will be published" and neither does the "website's

content submission form" which "simply instructs users to '[t]ell us what's happening.

Remember to tell us who, what, when, where, why.'").

In short, Xcentric is immune from liability for the allegedly false and defamatory

statements in the Rees Post because Xcentric did nothing to solicit or encourage the posting of

any false or defamatory statements.  Often, as in this case, frustrated litigants who dislike or

---

[12] To be clear, the appropriate question under Tenth Circuit precedent is not whether Xcentric encouraged "negative content," but whether the evidence shows that Xcentric encouraged ***false and defamatory content***, since that is what makes the Rees Post allegedly offensive.  *See F.T.C. v. Accusearch Inc.*, 570 F.3d 1187, 1199-1200 (10th Cir. 2009); *Ben Ezra, Weinstein, & Co., Inc. v. America Online Inc.,* 206 F.3d 980, 985 (10th Cir. 2000); *see also Shiamili v. Real Estate Grp. of New York, Inc.*, 952 N.E. 2d 1011, 1015, 1018 (N.Y. 2011) ("Creating an open forum for third-parties to post content—including negative commentary—is at the core of what section 230 protects").

disagree with the law attempt to creatively plead their way around Xcentric's Section 230 immunity by alleging that Xcentric contributed in some way to the creation of the user-generated report.  Courts have strongly condemned such efforts, explaining that Section 230 must be broadly construed and interpreted to protect websites absent clear evidence that the site directly contributed to the creation of illegal content:

> We must keep firmly in mind that this is an immunity statute we are expounding, a provision enacted to protect websites against the evil of liability for failure to remove offensive content. ***Websites are complicated enterprises, and there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality. Such close cases, we believe, must be in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites,*** fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties. Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost. But in cases of enhancement by implication or development by inference . . . section 230 must be interpreted to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Roommates.com*, 521 F.3d at 1174–75 (emphasis added); *see also Zeran*, 129 F.3d at 330 ("Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum."); *id.* at 330 ("The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. . . . Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.").

14

Despite Vision Security's attempts to create them, there are no genuine issues of material

fact regarding Xcentric's immunity under Section 230 and Xcentric is entitled to judgment as a

matter of law.[13]

**II.     FOR ADDITIONAL REASONS, XCENTRIC IS ENTITLED TO SUMMARY
         JUDGMENT ON VISION SECURITY'S CLAIMS UNDER THE UTAH
         DECEPTIVE TRADE PRACTICES ACT AND THE LANHAM ACT.**

Both Vision Security's Utah Deceptive Trade Practices Act claim and its Lanham Act

claim seek to treat Xcentric as the "speaker or publisher" of the Rees Post and, for that reason

alone, fail as a matter of law as a result of Xcentric's Section 230 immunity for the reasons

above.  [*See* Complaint ¶¶ 43-44, 47 (Lanham Act claim based on allegations that Xcentric is the

publisher of the Rees Post); ¶ 62 (Utah Deceptive Trade Practices Act claim, same).]

---

[13] Vision Security's claims also fail as a matter of law for at least two additional reasons.  First, because they are predicated on Rees's allegedly injurious speech, they are barred by the one-year statute of limitations that applies to defamation claims.  *See* Utah Code § 78B-2-302(4); *see also Bates v. Utah Ass'n of Realtors*, 297 P.3d 49, 50 (Utah Ct. App. 2013) ("To ensure that claims with defamation underpinnings are not recast and cleverly titled … to sidestep the one-year limitations period [for defamation] … 'the statute of limitations for defamation governs claims based on the same operative facts that would support a defamation action.'" (quoting *Jensen v. Sawyers*, 130 P.3d 325, 336 (Utah 2005) (applying one-year statute of limitations to false light claim))).  Second, the allegedly defamatory statements in the Rees Post are not actionable because, as a matter of law, they are true, statements of opinion, not capable of defamatory meaning, or privileged.  *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991) ("In this state, truth is an absolute defense to an action for defamation."); *West v. Thomson Newspapers*, 872 P.2d 999, 1018 (Utah 1994) (only speech that is "capable of being objectively verified as true or false" is potentially actionable as defamation); *Cox v. Hatch*, 761 P. 2d 556, 561 (Utah 1988) (to be actionable, a statement must be susceptible to a defamatory meaning); *Russell v. Thompson Newspapers, Inc.,* 842 P.2d 896, 902 (Utah 1992) (allegedly defamatory statement is protected by the fair comment privilege, and therefore not actionable, if it "involves a matter of public concern, is based on true or privileged facts, and represents the actual opinion of the speaker, but is not made for the sole purpose of causing harm").  Accordingly, in the event the Court is not persuaded that Vision Security's claims fail as a result of Xcentric's Section 230 immunity, Xcentric reserves the right to file a motion for summary judgment based on these additional grounds.

These claims also fail for the following additional reasons.

**A.      Vision Security's Utah Deceptive Trade Practices Act Claim Fails.**

Neither the allegations predicated on the Rees Post, which are barred by Section 230, nor the taglines that appear on Ripoff Report, support Vision Security's claim that Xcentric violated Utah's Deceptive Trade Practices Act.  The Act states that a party commits a "deceptive trade practice" when any one of a laundry list of offenses is undertaken.  U.C.A § 13-11a-3.  Vision Security does not specify which of these offenses Xcentric allegedly committed, but it appears Vision Security asserts claims under Utah Code § 13-11a-3(1)(b) & (h).  Vision Security claims there is a likelihood of confusion "as to the source, sponsorship, approval, or certification of services on Ripoff Report," presumably pursuant to Utah Code § 13-11a-3(1)(b).  [Complaint ¶ 56.]  Vision Security also alleges that Xcentric has made false or misleading representations of fact, which aligns with Utah Code § 13-11a-3(1)(h).

Vision Security claims that the taglines "by consumers, for consumers" and "Don't let them get away with it. Let the truth be known," are confusing, misleading and deceive the public because Xcentric "allows posts on Ripoff Report, such as the Rees Postings, that it knows are not authored by consumers and that it knows are misleading and untruthful."  [Complaint ¶ 59.]  As to the claim based on Xcentric's alleged knowledge that individuals other than consumers post on Ripoff Report, no reasonable fact-finder could determine that, because Xcentric uses the tagline "by consumers, for consumers," it is representing that every one of the millions of posts on its website are authored by consumers about a company with whom they conducted business. Moreover, the tagline is true because every human being is, in fact, a consumer.

16

As to the claim that Xcentric allows posts it knows are misleading and untruthful, Vision Security has failed to produce any evidence supporting this allegation.  Instead, the evidence shows Xcentric takes steps to ensure that third-party content posted on Ripoff Report is *not* misleading or untruthful by requiring users to agree—two separate times before posting a report—to post only information that is truthful, accurate, and valid.  [Beebe Decl. ¶¶ 8-9 & Exhs. "3" and "4" thereto.]  Xcentric may also redact statements found by a VIP arbitrator or court to be false or defamatory.  [Beebe Decl. ¶ 13; *see also id.* ¶ 16 & Exh. "5" thereto at XC000040; *id.* ¶ 17 & Exh. "6" thereto.]   In addition, Xcentric encourages businesses to post free rebuttals to negative reports, in which the business can defend itself and the allegations against it, including by pointing out any misleading or untruthful statements.  [Beebe Decl. ¶ 11; *see also id.* at ¶ 7 & Exh. "2" thereto at XC000041; *id.* ¶ 16 & Exh. "5" thereto at XC000406; Magedson Decl. ¶¶ 6-7 & Exhs. "1" and "2" thereto.]

Finally, as detailed above, there is no evidentiary support for Vision Security's allegation that "Ripoff Report will not allow any positive postings on its website."  [Complaint ¶ 61; *see* Magedson Decl. ¶¶ 6-7 & Exhs. "1" and "2" thereto.]  In fact, several of the rebuttals to the Rees Post itself were positive.  [*See* Beebe Decl. ¶ 5 & Exh. "1" thereto.]  Accordingly, this allegation likewise does not provide a basis for liability.

In short, there are no material issues of fact, and Xcentric is entitled to judgment as a matter of law on this claim.

**B.**     **Vision Security's Lanham Act Claim Fails.**

Vision Security's allegation of a Lanham Act violation is yet another example of an attempt at "clever lawyering" in an effort to evade the mandates of Section 230.  Vision Security essentially attempts to squeeze its defamation action into this federal statute.

1.     **Vision Security's Lanham Act Claim Does Not Pertain to Intellectual Property and Applying Section 230 Immunity in This Instance will Neither Limit nor Expand any Law Pertaining to Intellectual Property.**

Because federal intellectual property claims are excepted from immunity under Section 230, Vision Security is likely to take the position that its Lanham Act claim is an intellectual property claim.  Courts have expressed concern that certain claims that are not truly based on intellectual property might be treated as intellectual property to circumvent Section 230 immunity.  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 n.5 (9th Cir. 2007).  Even where a case concerns "nominal intellectual property claims," courts apply Section 230 when such immunity would not "limit the laws pertaining to intellectual property."  *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 885–86 (E.D. Wis. 2009), *aff'd,* 623 F.3d 436 (7th Cir. 2010); *see also Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 632–33 (E.D. Va. 2010) *aff'd,* 676 F.3d 144 (4th Cir. 2012) (finding that Section 230 immunity applied because the interactive computer service simply provided a portal for others who misappropriated trademarks).

Although the Lanham Act originally protected only trademarks (which *do* concern creations of the mind), the part of the Lanham Act relied on by Vision Security addresses trade libel/product disparagement.  *See Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1272-73 (10th Cir. 2000) ("[T]he [1988] amendments [creating the current version of 15 U.S.C. § 1125(a)] also overruled aspects of existing law, most significantly by covering trade libel or

18

product disparagement (i.e., misrepresentations about the plaintiff's goods and services) and by

permitting actions based on misrepresentations about commercial activities as well as goods and

services."); Jonathan H. Garside, *The Outer Limits of the Lanham Act's Section 43(a), When*

*Does Promotion Become Commercial Defamation?*, 74 Wash. U. L. Rev. 777, 780 (1996) (citing

134 Cong. Rec. 31,850 (1988)) ("The federal cause of action created by the new section 43(a) [of

the Lanham Act] is essentially a combination of the common-law torts of defamation and trade

disparagement."); Bradley C. Rosen, *Proof of Facts: Establishing a Claim for Trade Libel or*

*Product Disparagement Under § 43(a) of the Lanham Act, 15 U.S.C.A. Section 1125(a)*, 79 Am.

Jur. Proof of Facts 3d 1 (June 2016) ("The Lanham Trademark Act, in Section 43(a) creates a

cause of action for conduct that had traditionally been covered under the tort theory of 'injurious

falsehood,' more specifically referred to as trade libel or product disparagement.").

Trade libel under the Lanham Act is essentially a federal claim for defamation. *See Farm*

*Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1191 (D. Utah 2007) (citing

*Bankwest v. Fidelity & Deposit Co.,* 63 F.3d 974, 980 (10th Cir. 1995)) ("Although Farm Bureau

has stated its claims for business disparagement and trade libel/injurious falsehood separately,

case law establishes that they are merely different names for a single tort."); *TMJ Implants, Inc.*

*v. Aetna, Inc.*, 498 F.3d 1175, 1200 (10th Cir. 2007) (finding that a claim for product

disparagement is subject to the same defenses as a claim for defamation; and dismissing the

product-disparagement claim where the relevant statements would not support a defamation

claim); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991)

(simultaneously dispensing with "commercial disparagement" claims under both state law and

the Lanham Act).

A claim for trade libel under the Lanham Act implicates intellectual property no more than a claim for slander implicates intellectual property. In the face of a claim for trade libel, Section 230 immunity would neither expand nor limit laws pertaining to intellectual property. Thus, Vision Security's claim under the Lanham Act does not concern intellectual property and is not excepted from Section 230 immunity. *See Associated Bank-Corp. v. Earthlink, Inc.*, 05-C-0233-S, 2005 WL 2240952, at *4 (W.D. Wis. Sept. 13, 2005) (holding Section 230 bars a claim for trade disparagement under the Lanham Act). And, because Vision Security's claim seeks to treat Xcentric as a publisher of the third-party post, the claim is barred by Section 230.

### 2. Even Apart From Second 230 Immunity, Vision Security Cannot Survive Summary Judgment on Its Lanham Act claim.

The relevant provision of the Lanham Act requires a representation that is either (A) "likely to cause confusion" as to source of goods or services, or (B) expressed in "commercial advertising or promotion." 15 U.S.C. § 1025(a)(1). Vision Security can prove neither. Initially, Vision Security alleges that the Rees Post generally causes confusion. [Complaint ¶ 45.] But they do not claim that the post causes or is likely to cause confusion as to the source of their goods or services. Nor can they. No reasonable jury would ever find that a negative post on a consumer website causes confusion as to the source of the subject's goods or services.

Further, the Tenth Circuit has held that, for representations to constitute "commercial advertising or promotion" under the Lanham Act, the statements must be:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of "promotion," the representations (4) must be disseminated

> sufficiently to the relevant purchasing public to constitute
> "advertising" or "promotion" within that industry.

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000) (internal citations omitted).  A review like the Rees Post, placed in a public forum and concerning an individual's experience with an employer, is hardly commercial speech.  Xcentric is not in commercial competition with Vision Security.  Xcentric did not create the post, much less for the purpose of influencing Vision Security's consumers.  And a statement on a consumer review website does not constitute advertising or promotion within the home alarm system industry.  Thus, Vision Security cannot prove that the alleged misrepresentation was made in the context of commercial advertising or promotion.

As a result, there are no genuine disputes of material fact, and Xcentric is entitled to judgment as a matter of law on Vision Security's Lanham Act claim.

## CONCLUSION

For all of the foregoing reasons, Xcentric respectfully request that the Court grant Xcentric's Motion for Summary Judgment and dismiss Vision Security's and Harris's claims with prejudice.

DATED this 3rd day of August 2016.

PARR BROWN GEE & LOVELESS, P.C

/s/ Jeffrey J. Hunt
Jeffrey J. Hunt
Rachel L. Wertheimer

JABURG & WILK, P.C.
Maria Crimi Speth
Aaron K. Haar
Attorneys for Defendant Xcentric Ventures, LLC

21

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 3rd day of August 2016, I served a copy of the

foregoing **XCENTRIC'S MOTION FOR SUMMARY JUDGMENT** via the Court's CM/ECF

System, on:

      R. Brett Evanson (brett@evansonweber.com)
      Bradley J. Weber (brad@evansonweber.com)
      EVANSON WEBER
      2975 W. Executive Pkwy, Ste. 201
      Lehi, UT  84043


                                /s/ Rachel L. Wertheimer

22